Below is an Opinion of the Court.

_____
RANDALL L. DUNN
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In Re: ) | Bankruptcy Case |
| ) | No. 09-38572-rld7 |
| KAREN ELIZABETH STUBBLEFIELD, ) | |
| ) | MEMORANDUM OPINION |
| Debtor. ) | |

On May 25, 2010, I heard evidence and argument at the final evidentiary hearing ("Hearing") on the United States Trustee's ("UST") Motion to Dismiss Case Pursuant to 11 U.S.C. §§ 707(b)(1) and (b)(3) ("Motion to Dismiss"). At the conclusion of the Hearing, I took the matter under advisement.

In deciding this contested matter, I have considered carefully the testimony presented and exhibits admitted at the Hearing, as well as arguments presented orally. I further have taken judicial notice of the docket and documents filed in the debtor's chapter 7 case for purposes of confirming and ascertaining facts not reasonably in dispute. Federal Rule of Evidence 201; In re Butts, 350 B.R. 12, 14 n.1 (Bankr. E.D. Pa. 2006). In addition, I have reviewed applicable legal authorities. In light of that consideration and review, this Memorandum Opinion sets

Page 1 - MEMORANDUM OPINION

forth the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a), applicable with respect to this contested matter under Federal Rules of Bankruptcy Procedure 9014 and 7052.[1]

## Factual Background

There is no substantial disagreement between the parties as to the facts. The debtor, Karen Stubblefield ("Ms. Stubblefield"), is a well-educated woman with substantial financial experience and historically high income.

A) Educational Background and Employment History

Ms. Stubblefield graduated from Whitworth College in 1993 with a bachelor's degree in business. Since that time, with limited exceptions, she has worked in the mortgage business for a number of employers, including ITT Residential, Washington Mutual, AIG United Guaranty, National City Mortgage, and from April 2006 to the present, with Wells Fargo Bank ("Wells Fargo").

Ms. Stubblefield's first position with Wells Fargo was as sales manager for the Home Equity Division, where she hired, trained and supervised 25 sales agents. From January 2008 until April 12, 2010, Ms. Stubblefield served as a market development consultant for Wells Fargo. As of April 13, 2010, Ms. Stubblefield began in a new position as a home mortgage consultant for Wells Fargo Home Mortgage. Her duties include originating consumer home mortgages and hiring sales agents. After hiring her first sales agent, her title will be sales supervisor.

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the federal Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

Page 2 - MEMORANDUM OPINION

B) Events Leading up to Bankruptcy Filing

In 2006, Ms. Stubblefield became a member of NSW Investments LLC ("NSW"), a three-member LLC formed to invest in real estate. NSW purchased and managed real property in Arizona. At its high water mark, NSW had acquired eight investment properties.

When the "housing bubble" recession hit in 2007-2008, the Arizona real estate market crashed. The NSW members found that they were not able to retain renters for their investment properties willing to pay rents adequate to service the secured debt on the properties. In fact, the values of NSW's investment properties decreased to the point where they could not be sold for amounts adequate to pay off the secured liens on the properties. Ultimately, all of NSW's investment properties were foreclosed, and NSW was dissolved in 2008.

During 2007 and 2008, Ms. Stubblefield and the other NSW members invested heavily in attempts to ride out what they expected to be a temporary downturn in the real estate market. Ms. Stubblefield withdrew substantial sums from her retirement accounts and incurred substantial credit card debt, attempting to maintain NSW's rental properties and pay her share of associated mortgage debt. However, she soon came to the realization that she could not maintain this pattern of spending in light of the more long-term implications of the decline in real estate values.

C) Decision to File a Bankruptcy Petition and Events in Bankruptcy

Ms. Stubblefield first contacted a bankruptcy attorney in 2008, but she did not file a chapter 7 petition until October 19, 2009. She considered filing for relief in chapter 13 but ultimately opted for

Page 3 - MEMORANDUM OPINION

chapter 7. Subsequent to her bankruptcy filing, Ms. Stubblefield entered into a reaffirmation agreement with OnPoint Community Credit Union ("Credit Union") to reaffirm $28,377.97 in debt secured by a 2007 Chevrolet Tahoe ("2007 Tahoe"), with payments of $491 a month bearing interest at 4.49%. The docket in Ms. Stubblefield's chapter 7 case does not reflect that an order has been entered approving her reaffirmation agreement with the Credit Union, and her attorney did not sign off on the reaffirmation agreement.

On December 7, 2009, the UST filed a notice stating its conclusion that Ms. Stubblefield's chapter 7 filing was not presumed to be an abuse under § 707(b)(2). However, the UST filed the Motion to Dismiss on January 25, 2010. Wells Fargo, as first lienholder on Ms. Stubblefield's condominium unit residence ("Residence") filed a motion for relief from stay ("RFS Motion") on May 13, 2010. Ms. Stubblefield responded to the RFS Motion, requesting a hearing, on May 27, 2010, but admitted in her response that she was in default of her mortgage payment obligations to Wells Fargo. EMC Mortgage, the second lienholder on the Residence, has not moved for relief from the stay.

D) <u>Historical and Current Income Information</u>

Ms. Stubblefield's income information represents a microcosm of the ups and downs (mostly downs) in the real estate business since 2006. In her Statement of Financial Affairs, Ms. Stubblefield reports her gross employment income for 2007 as $402,378. She received additional rental income in 2007 of $18,507. In 2008, Ms. Stubblefield's gross employment income fell to $120,799, but her rental income increased to $134,816. In 2009, Ms. Stubblefield reported estimated gross employment income of

Page 4 - MEMORANDUM OPINION

$108,229, with additional rental income of $17,000, plus contributions to expenses from her domestic partner estimated at $3,207.

In her Form B22A statement of current monthly income at the time of her bankruptcy filing, Ms. Stubblefield reported gross monthly income of $10,417.45. On her Schedule I and in her reaffirmation agreement with the Credit Union, Ms. Stubblefield stated her current monthly income as $9,137.04. Ms. Stubblefield testified that in 2009 and through April 10, 2010, she earned approximately $10,000 a month, or $120,000 a year.

At the time of her bankruptcy filing, Ms. Stubblefield knew that her income would be declining further; she just did not know when. At her new Wells Fargo job, Ms. Stubblefield's gross earnings through two pay periods for work performed from April 11 through May 8, 2010 totaled only $2,300.58. However, Ms. Stubblefield testified that she was going to try to increase her income as soon as possible, and she expected that her income would increase substantially over a six months to one year time frame. As she progresses in her new job and hires additional sales agents operating under her supervision, her compensation potentially will increase based on the performance of those she supervises.

On March 11, 2010, Ms. Stubblefield received a $36,266 bonus from Wells Fargo, based primarily on her 2009 performance. The net bonus proceeds, after withholdings, in the amount of $25,277.40 were deposited into her personal bank account at JP Morgan/Chase. The bonus was not unexpected: In March, 2009, Ms. Stubblefield received an annual bonus from Wells Fargo in the gross amount of $28,615. At her Rule 2004 examination on April 7, 2010, Ms. Stubblefield testified that the bonus

proceeds were "paid out to medical expense right away." Ms. Stubblefield has a Health Savings Account through Wells Fargo, and in January, 2010, she elected a $5,000 contribution to her flexible spending account for the year.

Ms. Stubblefield has had two surgeries so far this year, including elective surgery through Oregon Weight Loss Surgery ("OWLS"). On March 23 and 25, 2010, Ms. Stubblefield withdrew $9,800 and $7,065.04 in cash from her JP Morgan/Chase account. She paid $7,065 to Legacy Emmanuel Hospital and $9,800 to the surgeon and OWLS. On March 18, 2010, Ms. Stubblefield paid out an additional $4,595 on a Bank of America credit card in her mother's name to cover use by Ms. Stubblefield of her mother's credit card for unreimbursed business expenses.

Through May 8, 2010, Ms. Stubblefield's 2010 earnings totaled $70,612.58.

E) 401(k)

Ms. Stubblefield contributes to a 401(k) plan through her employer, Wells Fargo. In her Schedule B, she reported $31,366.09 in her Wells Fargo 401(k) and an additional $56,160.99 in a Vanguard Retirement Account.

Ms. Stubblefield has borrowed from her 401(k) account as follows: $8,830 in August, 2008; $15,550.85 on August 11, 2009; and $5,550 on January 18, 2010. Ms. Stubblefield testified at her rule 2004 examination that she used the August 2009 401(k) loan proceeds to cover her housing expenses because she did not have enough money otherwise to make the trust deed payments for the Residence. Ms. Stubblefield also testified that she intended to continue to make a 6% contribution to her

Page 6 - MEMORANDUM OPINION

401(k) plan each pay period. However, she acknowledged that her 401(k) contributions have changed over time as her expenses have changed. She stated that she is able to change her contribution amount each pay period, depending on her expenses. Her contributions have varied from $0 to $240.35 per pay period.

F) <u>Rental Property</u>

Since August 2001, Ms. Stubblefield has owned a duplex rental property ("Duplex") jointly with her father. The Duplex is rented on a month-to-month basis, with total rental proceeds of $1,700 per month.

The Duplex is encumbered with first and second mortgages. Monthly mortgage payments are $967 and $456 respectively. Additional expenses, including garbage, water and sewer, liability insurance and reserves total approximately $258 per month. Accordingly, total monthly liabilities for the Duplex average approximately $1,681. However, monthly income from the Duplex does not provide enough excess funds to cover extraordinary maintenance expenditures, such as a damaged water main that generated over $2,200 in plumbing bills in 2009.

Ms. Stubblefield has stated that it is her intention to keep the Duplex because if she did not, her "father would lose the money and time he's put into it. And so would I." She testified that even though the income versus expenses associated with the Duplex typically are a "wash," there is a benefit to her retaining the Duplex to provide tax deductions. She also testified that typically in the event that Duplex expenses exceeded income for a particular month, her father made up the shortfall, and she expects that arrangement to continue.

Ms. Stubblefield valued the Duplex in her Schedules A and D at

Page 7 - MEMORANDUM OPINION

$240,000. In her Schedule D, she reported the first and second liens on the Duplex as totaling $232,949. She acknowledged that if she had to sell the Duplex currently, she would "probably end up paying a little or have to do a short sale."

G) <u>Residence Issues</u>

Ms. Stubblefield purchased the Residence for $685,000 in April 2006. In her schedules, she valued the Residence at $580,000. According to her Schedule D, she owed $600,877 on the first trust deed on the Residence. The first trust deed payments are $3,270 a month, and the first trust deed loan is a negative amortization loan. According to the RFS Motion filed by Wells Fargo, postpetition the amount owed on the first trust deed has risen to $612,069.14. In her response to the RFS Motion, Ms. Stubblefield does not contest the amount owed.

According to her Schedule D, Ms. Stubblefield owed $98,634 on the second trust deed on the Residence. Payments on the second trust deed obligation are $1,066 a month, and it bears interest at 12 ½% per annum.

Ms. Stubblefield has applied for loan modifications for both the first and second trust deed obligations on the Residence, and she considers herself a perfect candidate for loan modification approval. She testified at the hearing that she ultimately expects a modification of the first trust deed obligation on the Residence to go through. At the time of her Rule 2004 examination, Ms. Stubblefield was delinquent on both the first and second trust deed obligations on the Residence. In her response to the RFS Motion, she acknowledged that the first trust deed debt to Wells Fargo was in default.

Page 8 - MEMORANDUM OPINION

Ms. Stubblefield testified at the Hearing that if her loan modification proposals were not successful and she had to move out of the Residence, she could find rental accommodations in the same school district for $2,300-$2,700 a month. She even has considered moving into one of the Duplex units, but the "bedroom situation would be really tough."

H) Domestic partner and Family Arrangements

Ms. Stubblefield lives with a domestic partner. In her Form B22A, she reported monthly average contributions to income from her domestic partner as $534.50. Historically, his contributions to household income have been sporadic, but he obtained employment with Wells Fargo as of November 2009, and he now is earning a salary of $58,000 a year. His net monthly income is $3,474.59, from which he pays expenses totaling $2,143 a month on average.

In the past, Ms. Stubblefield has paid medical insurance for her domestic partner and his daughter. She permitted him to withdraw funds from her bank account to pay household bills and to pay for clothing and other items for his daughter. Ms. Stubblefield also paid the electricity bills for her domestic partner's ex-wife. With her domestic partner now being paid a regular salary, Ms. Stubblefield can expect more assistance from her domestic partner in paying the household bills, and she should face fewer calls to pick up his personal expenses.

Ms. Stubblefield also has shouldered the responsibility to pay $350 a month for medication for her chronically ill adult brother. During recent periods, the only time she did not make such payments was when her brother was under the care of the state of Oregon, and Ms.

Page 9 - MEMORANDUM OPINION

Stubblefield expects to continue to make these payments.

Ms. Stubblefield's household generally consists of herself and her domestic partner but sporadically includes his daughter, his niece and her brother but generally not all together.

## Jurisdiction

Since the Motion to Dismiss has material implications concerning Ms. Stubblefield's discharge and potential adjustments to her relationships with her creditors, I have core jurisdiction to determine the Motion to Dismiss under 28 U.S.C. §§ 1334 and 157(b)(1) and (b)(2)(J) and (O).

## Discussion

The UST seeks dismissal of Ms. Stubblefield's chapter 7 case under §§ 707(b)(1) and (b)(3). Section 707(b)(1) provides that, "After notice and a hearing, the court ... may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts ... if it finds that the granting of relief would be an abuse of the provisions of this chapter." There is no issue raised in this case as to whether Ms. Stubblefield's debts are primarily consumer debts. That point apparently is conceded by Ms. Stubblefield. <u>See</u> Trial Memorandum, filed in behalf of Ms. Stubblefield on May 21, 2010, at p. 9 (Docket No. 30). Section 707(b) then proceeds to prescribe two alternative avenues for determining whether a case is an abuse of the bankruptcy process.

First, § 707(b)(2) sets forth a "means test" formula pursuant to which abuse is presumed in circumstances where an ability to pay threshold is exceeded. Since the UST filed a statement of its

Page 10 - MEMORANDUM OPINION

determination following an appropriate investigation in this case that Ms. Stubblefield's chapter 7 filing was not a presumed abuse under § 707(b)(2), that subsection is not implicated in this matter.

Section 707(b)(3) provides that even if no presumption of abuse arises under § 707(b)(2), the bankruptcy court may consider dismissal of a bankruptcy case as an abuse if either (1) the case was filed in bad faith, or (2) "the totality of the circumstances ... of the debtor's financial situation demonstrates abuse." The UST argues that under either test, Ms. Stubblefield's chapter 7 case should be dismissed as an abuse. Since I agree with the UST that Ms. Stubblefield's case should be dismissed as an abuse in the "totality of the circumstances," as further discussed below, I will not address application of the "bad faith" test in this case.

Abuse in the "Totality of the Circumstances"

Section 707(b)(3)(B) does not provide any real guidance as to the factors to consider in evaluating whether "abuse" is present in light of the totality of the debtor's financial circumstances. In re Talley, 389 B.R. 741, 743 (Bankr. W.D. Wash. 2008). Courts have recognized, however, that § 707(b)(3)(B) represents a "codification of pre-BAPCPA case law." Id. (quoting In re Stewart, 383 B.R. 429, 432 (Bankr. N.D. Ohio 2008)). Accordingly, courts have looked to pre-BAPCPA case authorities for some assistance in determining what constitutes "abuse" in the totality of the circumstances. However, noting that pre-BAPCPA, the standard for dismissal under § 707(b) was "substantial abuse," the unadorned "abuse" standard for dismissal implemented by BAPCPA establishes a more relaxed standard, with no presumption favoring a

Page 11 - MEMORANDUM OPINION

discharge in chapter 7. See Egebjerg v. Anderson (In re Egebjerg), 574 F.3d 1045, 1048 (9th Cir. 2009):

> Prior to BAPCPA, there was a presumption "in favor of granting the relief requested by the Debtor." 11 U.S.C. § 707(b) (2004). This presumption could be overcome if the court found that "granting of relief would be a *substantial* abuse" of Chapter 7. ... BAPCPA produced a sea change. There is now no presumption favoring Chapter 7 relief, but an emphasis on repaying creditors as much as possible. H.R. Rep. No. 109-31, pt.1 at 2 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 89. (Emphasis in original.)

Pre-BAPCPA, the Ninth Circuit set forth a list of six nonexclusive factors for evaluating whether a chapter 7 case was a "substantial abuse" in the totality of the circumstances in Price v. United States Trustee (In re Price), 353 F.3d 1135, 1139-40 (9th Cir. 2004):

> (1) Whether the debtor has a likelihood of sufficient future income to fund a Chapter 11, 12 or 13 plan which would pay a substantial portion of the unsecured claims;
> (2) Whether the debtor's petition was filed as a consequence of illness, disability, unemployment, or some other calamity;
> (3) Whether the schedules suggest the debtor obtained cash advancements and consumer goods on credit exceeding his or her ability to repay them;
> (4) Whether the debtor's proposed family budget is excessive or extravagant;
> (5) Whether the debtor's statement of income and expenses is misrepresentative of the debtor's financial condition; and
> (6) Whether the debtor has engaged in eve-of-bankruptcy purchases.

Among the six Price factors, the Ninth Circuit determined that the first factor, the debtor's ability to pay a substantial portion of his or her unsecured debts, was of primary importance. Id. at 1140. "[A] debtor's ability to pay his debts will, standing alone, justify a

Page 12 - MEMORANDUM OPINION

section 707(b) dismissal." Id. (quoting Zolg v. Kelly (In re Kelly), 841 F.2d 908, 914 (9th Cir. 1988)). The first Price factor retains its importance in determining whether a chapter 7 case should be dismissed as an abuse under current § 707(b)(3). See In re McUne, 358 B.R. 397, 399 (Bankr. D. Or. 2006) (concluding that the fact that no presumption of abuse arises under § 707(b)(2) does not prevent the court from considering a debtor's actual ability to pay his or her unsecured debts in chapter 13 in determining whether dismissal is appropriate in the totality of the circumstances); In re Crink, 402 B.R. 159, 167 (Bankr. M.D.N.C. 2009) ("It is difficult to envision a situation where the totality of a bankruptcy debtor's financial situation does not include the debtor's ability to repay her debts.").

However, as noted above, the Price factors are nonexclusive elements in a "totality of the circumstances" determination. Some bankruptcy courts, including this one, have considered whether a debtor is eligible for relief under a chapter of the Bankruptcy Code other than chapter 7. See, e.g., In re Stewart, Case No. 08-33275-rld7 (Bankr. D. Or. March 11, 2009); In re Osting, 2009 WL 2611222 (Bankr. N.D. Ohio August 21, 2009). In addition, I will consider evidence of manipulation in bankruptcy planning and timing.

Evidence Relating to Ms. Stubblefield's Financial Situation

At the outset, the record is clear that Ms. Stubblefield is intelligent, able and has a history of high compensation in the real estate financing business to which she has devoted her professional life. While her income has declined significantly from the giddy heights of 2007, at the time of her bankruptcy filing, Ms. Stubblefield still was

reporting income in the range of $10,000 a month. As noted above, she stated her current monthly income in her Form B22A as $10,417.45, and reported her current monthly income in her Schedule I and in her subsequently filed reaffirmation agreement with the Credit Union as $9,137.04. Her income has declined significantly since then, but Ms. Stubblefield expects her income to rebound to the range of $10,000 a month within six months to a year. Through May 8, 2010, her 2010 earnings totaled $70,612.58, and at an annual salary of $58,000, her domestic partner's income appears stable. Based on her income history since 2007 to the present, it is not unreasonable to assume that Ms. Stubblefield could propose a chapter 13 plan that could pay a substantial amount to her unsecured creditors. Due to the recent fluctuations in her income, it is difficult to predict what Ms. Stubblefield's disposable income would be for chapter 13 purposes. However, in light of the recent decision of the Supreme Court in Hamilton v. Lanning, ___ S.Ct. ___, 2010 WL 2243704 (June 7, 2010), any decrease in Ms. Stubblefield's income from the petition date can be accommodated in a feasible plan proposed in chapter 13 prior to confirmation.

Based on review of Ms. Stubblefield's schedules, she appears to be eligible for relief in chapter 13, even considering the second lien on the Residence as wholly unsecured. See § 109(e); Scovis v. Henrichsen (In re Scovis), 249 F.3d 975, 981 (9th Cir. 2001); and In re Smith, Salguero and George, 419 B.R. 826 (Bankr. C.D. Cal. 2009). The disadvantage of chapter 13 for Ms. Stubblefield in comparison with chapter 7 is the requirement that she commit her disposable income for a period of 3-5 years in a chapter 13 plan. However, chapter 13 gives Ms.

Page 14 - MEMORANDUM OPINION

Stubblefield a formal reorganization framework within which to attempt to save her Residence from foreclosure that is not available in chapter 7. If her case is not converted to chapter 13, there appears to be little basis to deny the pending RFS Motion filed by Wells Fargo. Chapter 13 confers the additional advantage that it would allow for avoidance of the apparently wholly unsecured second lien on her Residence, a remedy that is not available in chapter 7 with respect to consensual liens. Compare Lam v. Investors Thrift (In re Lam), 211 B.R. 36 (9th Cir. BAP 1997) with Dewsnup v. Timm, 502 U.S. 410 (1992).

   Ms. Stubblefield has applied for a loan modification with respect to the second lien on her Residence and anticipates that if her loan modification request is granted, her payments would be reduced from $1,066 a month, including interest at 12 ½% per annum, to $422 a month. However, no evidence was presented at the Hearing that such loan modification had been approved. Even if her payments on the second trust deed obligation were reduced to $422 a month, avoidance of the second Residence lien in chapter 13 would result in freeing a total of $25,320 for payment of administrative expenses and unsecured claims over the term of a 60-month chapter 13 plan. If the payments remained at $1,066, the savings from lien avoidance over the term of a 60-month chapter 13 plan would total $63,960. I realize that part of the strategy for Ms. Stubblefield's chapter 7 filing had to be to obtain a discharge of her unsecured debts so that she could focus her resources and energies on finding some way to satisfy the enormous trust deed obligations on the Residence. However, that strategy does not make Ms. Stubblefield's chapter 7 filing any less abusive.

> In essence what the Debtors are asking is that they be permitted to use the bankruptcy process so that they can continue to honor an admittedly bad bargain while presumably seeking to discharge other obligations of the same nature. Such an approach is not acceptable. Bankruptcy is meant to afford an honest debtor a fresh-start, whereby the debtor is freed from preexisting financial burdens, and is not meant to be used as a means by which the debtor can perpetuate bad financial decisions.

In re Kaminski, 387 B.R. 190, 196 (Bankr. N.D. Ohio 2008), citing United States Dep't of Health and Human Servs. v. Smith, 807 F.2d 122, 123 (8th Cir. 1986).

In chapter 13, Ms. Stubblefield also may be able to cram down her obligation to the Credit Union secured by the 2007 Tahoe beyond any concessions made by the Credit Union in the reaffirmation agreement filed with the court, but not approved by any court order. Such a cramdown could free up additional funds from Ms. Stubblefield's disposable income to pay unsecured claims. With regard to the Duplex, in chapter 13, Ms. Stubblefield may be able to retain her interest in the Duplex if it does not depress her disposable income. Indeed, retention of the Duplex may even prove a benefit if through available tax deductions, her disposable income is increased.

A further consideration in my totality of the circumstances analysis in this case is the timing of Ms. Stubblefield's bankruptcy filing in light of the substantial bonus she was likely to receive in early 2010. Ms. Stubblefield testified that she first met with counsel to discuss a possible bankruptcy filing in 2008. She considered the option of filing for relief in chapter 13 as well as chapter 7, but ultimately chose to file in chapter 7. She filed her bankruptcy petition

Page 16 - MEMORANDUM OPINION

on October 19, 2009.  In March 2009, she received an annual bonus from Wells Fargo in the amount of $28,615.  She received her $36,266 bonus based on 2009 performance on March 11, 2010 and promptly spent most of the net proceeds to cover medical expenses, including elective weight loss surgery.

Ms. Stubblefield testified at the Hearing that weight issues have been a problem for her basically throughout her life.  She testified that she has been on diets off-and-on since the age of 7.  Maybe weight loss surgery was her only remaining viable strategy to deal with a chronic health problem.  Pre-bankruptcy planning is not inherently indicative of an abuse of the bankruptcy process, and I am not prepared to find that the timing of Ms. Stubblefield's bankruptcy filing was a "bad faith" effort to keep her expected annual bonus to fund elective surgery.  But, if the timing had been different, her bonus money might have been available to pay her unsecured creditors.  In the totality of the circumstances, I find the timing of Ms. Stubblefield's bankruptcy filing to allow her to keep most, if not all of her 2009 annual bonus for purposes other than to pay her creditors is relevant to an abuse determination.

## Conclusion

Based on consideration of the foregoing evidence in light of the standards for determining whether a chapter 7 case should be dismissed as an abuse, I find in the totality of the circumstances of Ms. Stubblefield's financial situation that her chapter 7 filing is an abuse under § 707(b)(3)(B).  That does not mean that I am in any sense finding that Ms. Stubblefield is a bad person, but in the circumstances presented

Page 17 - MEMORANDUM OPINION

through evidence at the Hearing, I conclude that allowing Ms. Stubblefield to continue in chapter 7 through discharge would be an abuse of the bankruptcy process. In conjunction with entry of this Memorandum Opinion, I will enter an order requiring Ms. Stubblefield to file a motion to convert her case to chapter 13 no later than Friday, July 2, 2010 or this case will be dismissed pursuant to the UST's Motion to Dismiss.